IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BENJAMIN G.,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **NO.   25-cv-1797** |
| | : | |
| **FRANK BISIGNANO,** | : | |
| **Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

<u>**MEMORANDUM OPINION**</u>

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                              **February 25, 2026**

Benjamin G. (Plaintiff) brought this action seeking review of the Commissioner of Social Security Administration's decision denying his claim for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.  This matter is before me for disposition upon consent of the parties.  For the reasons set forth below, Plaintiff's Request for Review (ECF No. 11) is **GRANTED**, and the matter is remanded for further proceedings consistent with this memorandum.

## I.    PROCEDURAL HISTORY

This case is before me for the second time, after I remanded to the Administrative Law Judge (ALJ) based on errors related to the ALJ's treatment of certain medical opinions contained in the record.  *See Benjamin G. v. Kijakazi*, 676 F. Supp. 3d 383 (E.D. Pa. 2023).  Plaintiff initially protectively filed for SSI on November 28, 2019, alleging disability since January 1, 2019, due to Crohn's disease, chronic pain, depression, anxiety, acid reflux, and nausea.  (R. 81, 84, 210).  His application was denied at the initial level and upon reconsideration, and he requested a hearing before an ALJ.  (R. 110-20).  Plaintiff, represented by counsel, and a

vocational expert (VE) testified at a March 25, 2021, administrative hearing. *Benjamin G.*, 676 F. Supp. 3d at 386. On June 29, 2021, the ALJ issued a decision unfavorable to Plaintiff. *Id.* He appealed the ALJ's decision, but the Appeals Council denied his request for review on April 8, 2021, thus making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. *Id.*

On January 28, 2022, Plaintiff filed a complaint in the United States District Court for the Eastern District of Pennsylvania alleging, among other things, that the ALJ erred in her treatment of the medical evidence contained in the record. *Id.* at 386, 393-94. While the matter was pending in this Court, Plaintiff filed a subsequent SSI disability claim alleging similar impairments. (R. 1286). I granted Plaintiff's request for review[1] and remanded the case to the ALJ for further proceedings. *Benjamin G.*, 676 F. Supp. 3d at 403. Upon remand from this Court, the Appeals Council consolidated the subsequent claim with Plaintiff's original claim for disability, thereafter remanding the case to the ALJ for further consideration consistent with my order and accompanying memorandum opinion. (R. 1286, 1361-99).

The ALJ held a second administrative hearing on July 16, 2024, at which Plaintiff, represented by counsel, and a VE testified. (R. 1310-60). At the hearing, Plaintiff amended the alleged onset date to November 28, 2019, the date of his initial application. (R. 1318). On December 19, 2024, the ALJ issued a decision unfavorable to Plaintiff. (R. 1283-1309). The Appeals Council did not review this second decision, thus making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. (Pl.'s Br., ECF No. 11, at 1-2).

On April 7, 2025, Plaintiff filed a complaint in the United States District Court for the

---

[1] Specifically, in addressing Plaintiff's former argument that the ALJ erred in her treatment of the medical opinions of Adam Kaufman, M.D. and Elena DelBusto, M.D., I determined that the ALJ had ignored relevant evidence when evaluating the supportability and consistency of each opinion. *Benjamin G.*, 676 F. Supp. 3d at 396-401.

Eastern District of Pennsylvania and consented to my jurisdiction the next day, pursuant to 28 U.S.C. § 636(C).  (Compl., ECF No. 1; Consent Order, ECF No. 4).  On September 23, 2025, Plaintiff filed a Brief and Statement of Issues in Support of Request for Review.  (Pl.'s Br., ECF No. 11).  The Commissioner filed a Response on November 19, 2025, and on December 3, 2025, Plaintiff filed a Reply.  (Resp., ECF No. 17; Reply, ECF No. 18).

## II.    FACTUAL BACKGROUND

The Court has considered the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.

Plaintiff was born on November 6, 1998, and was 21 years old on the alleged disability onset date.  (R. 228).  He completed eleventh grade.  (R. 211).  Plaintiff previously worked as a laborer and delivery person in food service.  (*Id.*).

### A.    Medical Evidence

#### 1.    Physical

On December 15, 2015, Plaintiff, then 17 years old, presented to the Children's Hospital of Philadelphia with a one-year history of abdominal pain, which had worsened over the prior few weeks.  (R. 673).  The pain was "functional in nature," but Plaintiff had lost 30 pounds throughout the year because eating made the pain worse, leading to a poor appetite.  (R. 675-77).  Following a physical examination, the treating physician noted that "his symptoms [were] most concerning for inflammatory bowel disease" and scheduled him for an upper endoscopy and colonoscopy the next day.  (R. 676).  He was diagnosed with Crohn's disease and began a course of treatment, receiving intermittent infusions of Remicade.  (R. 733).

On April 28, 2017, Plaintiff went to the Chestnut Hill Hospital emergency room (ER) after not feeling well the prior two days with nausea, abdominal pain, and vomiting.  (R. 1038,

1040).  The visit was precipitated by a two-day-long flare-up of his symptoms.  (R. 1040).  It was also noted that he had recently begun a course of new medication.  (*Id.*).  The treatment notes from this visit described his Crohn's disease as "poorly controlled" and the course and duration of his symptoms were described as "constant," although his examination results were largely normal.  (R. 1040-42).  Within a few hours, he was described as "stable" and discharged.  (R. 1043).

On August 15, 2019, Plaintiff treated with Brandon Eberts, PA, at Main Line Gastroenterology Associates (MLGA).  (R. 531-35).  He had lost 13 pounds since April 2019 due to lost appetite caused by intermittent nausea and acid reflux.  (R. 405).  He reported abdominal pain, which was "complicated by possible overlap IBS [irritable bowel disease] visceral hypersensitivity and chronic generalized abdominal pain."  (R. 402).  In reviewing Plaintiff's treatment history for his abdominal pain, Eberts noted that in January 2017, Plaintiff underwent a Small Bowel Follow-Through imaging test, which revealed "moderate stool burden in [Plaintiff's] colon" that may have contributed to his pain.  (R. 532).  An EUS-guided celiac plexus block was administered in August 2018, though it offered no relief to Plaintiff's symptoms.  (*Id.*).  Eberts also noted that Plaintiff's depression was "[c]ertainly [a] contributing factor to chronic pain and associated issues with overlap anxiety, unclear how much related to marijuana use."  (R. 532).  However, he further noted that the medical marijuana improved Plaintiff's pain and allowed him to sleep better.  (R. 534).  Plaintiff was directed to continue with Remicade and Pantoprazole, start Zantac for his abdominal pain, and continue his course of treatment for his depression given the potential connection between his physical and mental issues.  (R. 532-33).

Plaintiff returned to the Chestnut Hill Hospital ER on November 22, 2019, for abdominal pain and cramping stemming from his Crohn's disease, tingling in his extremities,

lightheadedness, and a nosebleed.  (R. 985-86).  He was "actively vomiting in triage."  (R. 985).  He stated that his abdominal pain had started a few weeks ago and worsened on the date of the hospital visit.  (*Id.*).  Patient was given Bentyl and Haldol and discharged after he was noted to be "hemodynamically stable and with a benign abdomen."  (R. 990).

On January 7, 2020, Plaintiff contacted Adam Kaufman, M.D., of MLGA about anal fissures lasting the prior two weeks without relief from a bidet and lidocaine cream.  (R. 636).  Dr. Kaufman prescribed Rectiv ointment.  (*Id.*).  Bloodwork two weeks later was normal other than minimally elevated sugar levels.  (R. 634).

On March 11, 2020, Plaintiff presented to Dr. Kaufman for his Crohn's disease and chronic pain.  (R. 508).  Plaintiff reported experiencing ups and downs with his Remicade course and Dr. Kaufman noted that Plaintiff had rescheduled an August 2019 infusion to the following month.  (*Id.*).  The progress note indicates that Plaintiff was scheduled to receive infusions every six weeks.  (*Id.*).  Plaintiff described his gastrointestinal symptoms as "alright" and his abdominal pain as a one or two on a one-to-ten scale.  (*Id.*).  His bowel habits were "stable" albeit "with intermittent diarrhea that resolves on its own."  (*Id.*).  He had no urgency and was able to distinguish between having to pass stool and gas.  (*Id.*).  Plaintiff had intermittent acid reflux brought on by not eating for long periods.  (*Id.*).  His physical examination was generally normal, although with "minimal diffuse abdominal tenderness without localization."  (R. 510).  Dr. Kaufman recommended that Plaintiff continue his schedule of Remicade.  (R. 511).

On August 25, 2020, State agency medical consultant Toni Jo Parmelee, D.O., opined that Plaintiff could occasionally lift and carry up to 20 pounds and frequently lift and carry up to 10 pounds; in an eight-hour workday, stand and/or walk for two hours and sit for six hours; push and pull without additional limitations; occasionally climb ramps and stairs, balance, stoop and crouch; but never climb ladders, ropes and scaffolds, kneel, or crawl.  (R. 95-96).  She further

determined that Plaintiff must avoid concentrated exposure to humidity, vibrations, hazards, extreme heat and cold, and respiratory irritants.  (R. 97).

On September 17, 2020, Plaintiff presented to Samuel Reich Eldrich, M.D., in the Chestnut Hill Hospital ER with cramping, abdominal pain, nausea, and "multiple episodes of vomiting."  (R. 976).  Dr. Eldrich noted that this flare of symptoms was "similar to prior episodes."  (*Id.*).  On examination, Plaintiff had diffuse tenderness to touch but no abdominal guarding or rebound, and his abdomen was soft with normal bowel sounds.  (R. 979).  Plaintiff again improved with Haldol and Bentyl and was discharged as hemodynamically stable and with no fever.  (R. 980-81).

Two days later, Plaintiff returned to the Chestnut Hill Hospital ER complaining of "intermittent diffuse abdominal pain," cramping, and vomiting mucus.  (R. 968).  Plaintiff noted he had passed a "loose" stool that morning.  (*Id.*).  Physical examination results were largely normal, although laboratory testing showed small amounts of ketones in his urine.  (R. 968, 972-73).  His symptoms were described as not consistent "w/Crohn's flare—no diarrhea or blood" and more consistent with "cyclic vomiting."  (R. 973).  Plaintiff was instructed to cease his marijuana usage, and he agreed.  (*Id.*).  He was discharged after he responded well to Haldol. (*Id.*).

On December 10, 2020, Plaintiff presented to the Chestnut Hill Hospital ER complaining of multiple episodes of nausea and vomiting over the prior day.  (R. 960).  Physical examination and laboratory results were generally normal, and Plaintiff again improved with Haldol and Bentyl and was discharged as afebrile and hemodynamically stable.  (R. 961-65).

Plaintiff had an annual checkup on February 5, 2021, conducted by Michael Hirsch, M.D. (R. 956).  The physical examination results were normal, including as to Plaintiff's abdomen. (R. 958).

On March 12, 2021, Dr. Kaufman completed a Crohn's & Colitis Medical Source Statement.  (R. 662-64).  He noted that Plaintiff had been his patient since December 2016, with office visits and frequent treatments, and that Plaintiff had diagnoses of Crohn's disease, chronic pain, and depression and anxiety with a fair prognosis.  (R. 662).  Plaintiff's symptoms included chronic and bloody diarrhea, anal fissures, nausea, fatigue, mucus in stool, constant and daily pain, and possible weight loss, vomiting, abdominal distension, and fistulas.  (*Id.*).  The symptoms were described as "episodic" with periods of "flares."  (*Id.*).  Clinical findings included pain upon examination and laboratory testing results.  (*Id.*).  Dr. Kaufman concluded that Plaintiff needed to take unscheduled restroom breaks lasting 30 to 60 minutes multiple times daily, sometimes within "seconds" of feeling the urge to use the restroom.  (R. 663).  He opined that Plaintiff would sometimes need to lie down to rest at unpredictable intervals, that he would have good and bad days, and that he would miss work more than four times per month.  (*Id.*).

### 2. Mental

Plaintiff received psychotherapy from Ameet Ravital, Ph.D., at Mt. Airy Psychotherapy and Wellness between June 10, 2016, and June 10, 2018.  (R. 614-32).  Depression questionnaires completed by Plaintiff on December 2, 2016, and June 10, 2018, indicate "mild-moderate" depression worsening to "moderate/severe."  (R. 615, 618).  Throughout treatment, he often talked about how his physical symptoms contributed to his depression.  (*See, e.g.*, R. 616-17, 619-20, 622).  Plaintiff ultimately discontinued the sessions because he felt that his situation was hopeless and that the therapy was not helping.  (R. 616).

Plaintiff attended group therapy sessions at Sanare Today in West Chester, Pennsylvania, between February and April 2019.  (R. 285-334).  Upon intake, his mental status examination results were normal.  (R. 333).  He expressed a desire "to try something new and try and get better."  (R. 334).  He complained of social withdrawal stemming from his Crohn's disease, a

negative outlook, and irritability.  (*Id.*).  Over the course of therapy, Plaintiff reported fluctuating levels of depression, anxiety, and sleep difficulties, frequently discussed how his physical pain impacted his sleep habits and mental symptoms, and learned various strategies and techniques to cope with his conditions.  (R. 285-334).  At times he also discussed his relationship with his family and his use of medical marijuana for pain management.  (*Id.*).

On March 29, 2019, Plaintiff visited psychiatrist William C. Jangro, D.O., at Jefferson Psychiatry and Human Behavior Center City in Philadelphia.  (R. 338).  His primary diagnosis was "severe episode of recurrent major depressive disorder, without psychotic features."  (*Id.*).  Plaintiff reported that his mood had improved "a little" but that he had "been unable to further cut down" on his marijuana use.  (R. 339).  He also reported decreased concentration and trouble sleeping.  (*Id.*).  His mental status examination was noteworthy for a pale appearance, slow speech, and depressed mood, but was otherwise largely normal.  (R. 340).  He exhibited fair insight and judgment.  (*Id.*).

On November 5, 2020, State agency psychological consultant Marci Cloutier, Ph.D., opined that Plaintiff was moderately limited in his ability to carry out detailed instructions, complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the public, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting, but that he had no other significant limitations.  (R. 98-102).

While treating with Psychiatric Associates of Pennsylvania in Wynnewood, Pennsylvania, Plaintiff completed Anxiety and Depression Inventories at different times.  In January 2020, his scores on these questionnaires[2] corresponded to "very low anxiety" and "mild

---

[2]  These questionnaires are accompanied in the record by handwritten progress notes,

mood disturbance." (R. 470-73). However, by December 2020, his anxiety and depression had both worsened to "moderate" according to questionnaires completed at that time. (R. 604, 606-09).

On February 15, 2021, Amy Poppel, M.S.S., L.C.S.W., wrote a treatment summary narrative regarding Plaintiff. (R. 601-02). She noted that Plaintiff lost his friends after withdrawing from school due to his Crohn's disease. (R. 601). She explained that home tutoring also failed due to the amount of schoolwork Plaintiff had missed. (*Id.*). She related that Plaintiff then attempted to obtain a high school diploma equivalent at community college, but he ultimately stopped taking classes after missing too much time due to his symptoms. (R. 601-02). When asked how Plaintiff could play video games but not complete schoolwork, he responded, "I don't know." (R. 602). She described Plaintiff as presenting as angry and depressed and alternating between periods of silence and stories about his family's alleged unfairness toward him. (R. 601-02). Family sessions were offered, but Plaintiff declined them because he believed they would not prove successful. (R. 602). Poppel explained that after Plaintiff's psychiatrist put limits on the types and amounts of medical marijuana he would prescribe, Plaintiff became "extremely angry" and terminated the relationship to pursue his preferred medications with another psychiatrist. (*Id.*). She noted Plaintiff participated in intensive outpatient treatment at Solare Treatment Center (Solare) but that he deployed the skills learned there "somewhat erratically" and regularly missed mindfulness classes recommended by Solare. (*Id.*). After completing the mindfulness program, he returned to therapy but chose to terminate it because "he didn't feel he was getting much out of [therapy]. He was encouraged to explore his ambivalence about his treatment but declined. Throughout his work, he struggled to trust this

apparently from Dr. DelBusto based on a comparison with her known signature. However, the notes are largely illegible. (*See generally* R. 469-98, 561-85).

therapist and form a meaningful attachment." (*Id.*).

Plaintiff attended an Intensive Outpatient Program at Sanare Treatment Center for his increased depression and demonstrated some of the skills he learned there, although "somewhat erratically." (R. 602). He attended the program at Sanare from January 30 until April 22, 2019. (R. 285-334). At his initial appointment, he reported severe longstanding depression because of his chronic pain and the limitations imposed by his severe Crohn's disease. (R. 333). Plaintiff reported feeling lonely every day, worrying, fearing talking with others, irritability, and having a negative outlook on himself, his situation, and his future. (R. 334).

On October 28, 2020, Elisabeth Gibbings, Psy.D., conducted a consultative mental evaluation of Plaintiff. (R. 586-99). Plaintiff reported difficulty falling asleep and concentrating due to pain and anxiety, losing 30 pounds due to his Crohn's disease, nightmares, depressed mood, hopelessness, past suicidal ideation, irritability, tense feelings, and monthly panic attacks with hyperventilation, agitation, and racing thoughts. (R. 587). He denied hallucinations, memory problems or difficulty learning new material. (*Id.*). His examination showed a cooperative attitude, adequate social skills, normal appearance and speech, coherent and goal-directed thought processes, a flat affect, clear sensorium, full orientation, mildly impaired attention and concentration, intact memory, average cognitive functioning, fair insight and good judgment. (R. 588-89). When asked about his mood, he replied it was "alright, I suppose." (R. 588). His reported activities of daily living (ADLs) included personal care, some household chores, shopping, food preparation, volunteering at a museum, birdwatching, making model airplanes, playing video games alone, and reading. (R. 589). He noted a good relationship with his parents but that he had lost contact with friends. (*Id.*). His prognosis was recorded as "fair, given the medical issues." (R. 590). Dr. Gibbings opined that Plaintiff had a mild impairment in carrying out complex instructions, interacting appropriately with supervisors and coworkers, and

responding appropriately to usual work situations and changes in a routine work setting and a moderate impairment in interacting with the public, but no other impairments. (R. 591-92). She explained that Plaintiff had mildly impaired attention and concentration and an intact memory with "inconsistencies." (R. 591).

On March 19, 2021, Dr. DelBusto opined that Plaintiff had an unlimited or very good ability to get along with coworkers, interact appropriately with the general public, be aware of normal hazards and take appropriate precautions, adhere to basic standards of neatness and cleanliness, and understand, remember, and carry out very short and simple instructions; a limited but satisfactory ability to remember work-like procedures, ask simple questions or request assistance, and to accept instructions and respond appropriately to criticism from supervisors; a seriously limited ability to maintain attention for a two-hour segment; a lack of ability to meet competitive standards in dealing with normal work stress, responding appropriately to changes in a routine work setting, performing at a consistent pace, working in coordination with or proximity to others without being unduly distracted, sustaining an ordinary routine without special supervision, and maintaining regular attendance and being punctual within customary, usually strict tolerances; and no useful or functional ability to make simple work-related decisions and complete a normal workday and workweek without interruptions from psychologically based symptoms. (R. 1161). Regarding the reasons Plaintiff would have difficulty working at a regular full-time job on a continuing basis, she wrote: "Ben's depression is very closely tied to his physical health. He has difficulty doing tasks for extended periods of time, [illegible] exacerbates his pain [illegible] and impairs him from working efficiently and productively." (R. 1162). She predicted that Plaintiff would miss more than three days of work per month due to his impairments. (*Id.*). She indicated that Plaintiff does not have ongoing treatment that diminishes his symptoms and explained that "Ben is on meds and sees me monthly

[every six weeks] but continues to be symptomatic [because] his GI problems are chronic and directly affect his mental health." (R. 1163).  She further noted that Plaintiff demonstrates "marginal adjustment" and is able to make "minimal changes" to adapt to his environment or to demands not already part of his daily life.  (*Id.*).

Plaintiff treated with mental health counselor and psychotherapist Nathan Schlingmann, M.A., between January 2022 through June 2024.  (R. 1662-1704).  On July 15, 2024, Schlingmann offered a treating source statement and medical opinion regarding Plaintiff, stating that Plaintiff: has chronic depression that stems from his physical impairments; struggles with maintaining his energy level, and that he can "barely" keep up with the demands of a 12-hour workweek given that he does not have "enough energy to socialize with his colleagues"; is "seriously limited" in his abilities to maintain attention for two-hour segments and deal with normal work stress; and is "unable to meet competitive standards" in his abilities to maintain regular attendance and be punctual within customary, usually strict tolerances, complete a normal workday and workweek without interruptions from psychologically-based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods.  (R. 1705-08).  In addition, Schlingmann opined that due to his conditions, Plaintiff would miss more than three days of work per month.  (R. 1707).

### B.    Non-Medical Evidence

The record also contains non-medical evidence.  In an Adult Function Report dated January 28, 2020, Plaintiff stated that his pain often causes him to become short-tempered or mistake-prone and makes it difficult or impossible to concentrate or do anything other than rest. (R. 219).  His pain also makes it difficult for him to fall asleep.  (R. 220). His symptoms make him stop whatever he is doing to use the restroom, thereby making it difficult to complete tasks. (R. 219).  He spends his days using the computer after completing unspecified "tasks."  (R. 220).

He cares for two dogs with some assistance from his parents, with whom he lives. (*Id.*). He has

no difficulties with personal care but sometimes requires reminders to care for minor health

issues. (*Id.*). Plaintiff prepares simple meals, vacuums, dusts, mows the lawn, shovels snow,

takes out the trash, and does small repairs and yardwork, although he often requires

encouragement or breaks because of his symptoms. (*Id.*). He goes outside every day, if only for

a limited amount of time. (R. 221-22). He is able to walk, drive, and use public transportation

alone, shop online and in stores, and manage money. (*Id.*). Plaintiff's hobbies include playing

video games, reading, "learning how things work," making models, painting, and using the

internet. (R. 223). He goes to dinner or the movies or engages in a similar activity two to three

times per week with his family but does not socialize with friends. (R. 223-24). Plaintiff

checked boxes on the form indicating difficulties with completing tasks and concentration. (R.

224). He can walk "several miles" and usually pay attention for three to four hours, but only 30

minutes if he has pain or has to use the restroom. (*Id.*). He can generally follow instructions

unless distracted by pain, handle low levels of stress, and adjust to new routines if given time.

(R. 224-25).

This Court summarized Plaintiff's testimony at the March 25, 2021, administrative

hearing as follows:

> Plaintiff testified that he lives with his parents in their house. He
> has a driver's license and drives most days. Plaintiff stopped
> attending high school in eleventh grade due to his worsening
> symptoms and then had a home tutor. He testified that he
> subsequently switched to community college classes to obtain a high
> school diploma. He reported missing class regularly due to his
> symptoms, even after they switched from in-person to remote. He
> explained that he last worked for pay as a Door Dash driver until
> March 2020 but stopped due to Covid-19 because he is "somewhat
> immunocompromised." He then received Pandemic Unemployment
> Assistance, for which he certified that he was ready, willing, and
> able to work, although he testified that this was a reference only to
> his limited Door Dash work.

13

> Since the summer of 2020 he has volunteered twice a week doing odd jobs at an aviation museum but "somewhat regularly" arrives late or leaves early, takes breaks, and misses approximately half of his scheduled time due to symptoms of his Crohn's disease, including pain, nausea or having to go to the restroom. He described his pain as "daily and constant," varying between two and eight on a one-to-ten scale and somewhere between three and five most days. The pain makes it difficult to concentrate or complete simple tasks. He also experiences abdominal "churning" during which he cannot tell if has to use the restroom or only has gas. This churning requires him to visit the restroom upwards of four or five times per day to avoid accidents. Plaintiff normally spends 20 to 30 minutes in the restroom at a time and uses a bidet because he also suffers from anal fissures approximately half the time. He must apply topical products. Because of Plaintiff's conditions, he is most comfortable sitting or lying down and normally lies down for an hour or two in the afternoon.
>
> He uses prescribed medical marijuana "daily as needed" for pain management and assistance sleeping. The initial prescribing physician, Dr. Jangro, later wanted to prescribe Plaintiff something else because his improvement on medical marijuana had plateaued. Plaintiff stopped using medical marijuana for a few weeks, and tried versions without THC, but his symptoms allegedly worsened. He then sought a second opinion from Dr. DelBusto and began treating with her instead. He reported using less medical marijuana with Dr. DelBusto than originally with Dr. Jangro. Plaintiff testified that Dr. DelBusto believes the medical marijuana has been effective in treating his symptoms and that she continues to prescribe it.
>
> Plaintiff also suffers from depression "pretty regularly" and anxiety "fairly regularly" or three to four times per week. Additionally, he experiences anger, agitation and irritability if he has a few consecutive bad days of symptoms. He only socializes with family members and lost most of his friends after leaving high school. He plays video games online with strangers and occasionally posts to Reddit.

*Gongon*, 676 F. Supp. 3d at 391-92 (record citations omitted).

At the July 16, 2024, administrative hearing, Plaintiff testified that he: lives with his parents and younger sister; has his driver's license, drives five or six days per week, and occasionally uses public transportation; is employed as a cashier and works two six-hour shifts per week; spends his free time at a local board game shop playing games with others; enjoys

studying birds; rarely takes care of the family's dogs; received his GED in lieu of a high school diploma and had taken several college-level courses; had volunteered for two different organizations over the prior four years with "varying levels of . . . attendance"; was capable of lifting up to 100 pounds, walking 45-60 minutes before taking a break, and sitting between two and three hours before needing to "go do something to help [his] stomach"; and uses medical marijuana daily to help with his symptoms. (R. 1322-34). Plaintiff testified that his duties volunteering at the aircraft museum primarily involved restoration, including painting, sanding, and other carpentry-related jobs. (R. 1327). He further testified that he frequently calls out sick from his cashier shifts to stay home and rest, and that he also is allowed to take extra unscheduled 10-minute breaks to deal with his symptoms. (R. 1335). He also frequently left the board game shop early due to his symptoms. (R. 1345-46).

Plaintiff also testified as to his course of Remicade treatment. He stated that he first received infusions every eight weeks, but due to feeling like the medicine was wearing off after a bit, he switched to his current six-week regimen. (R. 1337-38). Based on this change, Plaintiff testified he no longer experiences a period right before his infusions where he feels "noticeably worse." (R. 1338). Nevertheless, he testified to "feeling bad all the time," and stated that he experiences intermittent flares in his symptoms that incapacitate him. (*Id.*). His pain was never lower than two on a scale of 10, and his abdomen always felt "tight[]." (R. 1342). He experienced unpredictable but frequent sharp eight-out-of-ten pains in his abdomen that felt like he was being poked or stabbed. (*Id.*). These symptoms can last up to 48 hours in duration. (R. 1344). Plaintiff testified that he kept medications on hand that helped remediate his pain and gastrointestinal symptoms during urgent or emergent situations. (R. 1339-41). Plaintiff noted that his "anti-spasm" medicine for his gastrointestinal symptoms was fast-acting and helped to remediate his symptoms, depending on their severity. (R. 1340).

15

Plaintiff next testified that he suffered from anal fissures "daily," though he acknowledged that in the past his symptoms related to the fissures only flared up several times per year. (R. 1346). Using the restroom exacerbates his symptoms, though Plaintiff acknowledged that the medication prescribed by Dr. Kaufman helps him. (R. 1347).

Finally, Plaintiff testified regarding his mental health issues. He noted that his depressive symptoms were related to his health issues, that he was "sad about [his] situation in general," and that he regularly feels "hopeless just thinking about how little [he is] able to achieve with the effort [he is] putting in." (R. 1349). Plaintiff also testified that he experiences anxiety when trying to determine whether he can go to work each day, before his shifts. (*Id.*). Notwithstanding his symptoms, however, Plaintiff confirmed that the antidepressants that Dr. DelBusto prescribed to him helped him deal with his symptoms. (R. 1349-50).

## III.    ALJ'S DECISION

Following the administrative hearing, the ALJ issued a decision in which she made the following findings:

1.    The claimant has not engaged in substantial gainful activity since November 28, 2019, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: Crohn's disease/irritable bowel disease (IBS), chronic pain syndrome, anxiety, and depression (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, I find that the claimant has the

residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except for the following limitations. The claimant is able to occasionally lift 20 pounds, frequently lift and/or carry 10 pounds; stand and/or walk for a total of about 4 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday. Pushing/pulling is limited to occasional with the upper extremities. The claimant is limited to occasional postural maneuvers but never climbing ladders, ropes, and scaffolds; crouching; kneeling; or crawling.  The claimant must avoid all exposure to hazardous machinery and unprotected heights and must avoid more than occasional exposure to extreme cold, heat, humidity, and vibration. He is limited to unskilled work with routine and repetitive tasks [and] can tolerate occasional changes in the work setting.  He can work at a consistent pace throughout the workday but not at a production rate pace where each task must be completed within a strict time deadline. He can tolerate occasional interaction with co-workers and supervisors and the public. The claimant requires ready access to a restroom meaning it must be 2-3 minutes from workstation[, and he] will be off task no more than 10% of the workday due to any reason.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on November 6, 1998 and was 21 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education but currently has at least a high school education (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past

17

relevant work (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since November 28, 2019, the date the application was filed (20 CFR 416.920(g)).

(R. 1288-1303).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 1303).


## IV.    LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to the Commissioner that she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. § 1382c(a)(3)(A).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities.  If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of the impairment listed in the "listing of impairments," . . . which result in a presumption of disability, or whether the claimant retains the capacity to work.  If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform his past work.  If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. § 416.920(a)(4).  The

disability claimant bears the burden of establishing steps one through four.  If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner at step five to establish that, given the claimant's age, education, work experience, and mental and physical limitations, he is able to perform substantial gainful activities in jobs existing in the national economy.  *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited.  A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards.  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate."  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted).  Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it.  *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).  The court has plenary review of legal issues.  *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## V.    DISCUSSION

In his request for review, Plaintiff raises three claims:[3]

1.    The ALJ erroneously rejected the opinions of the treating physicians.

2.    Because the ALJ disregarded critical evidence, she overstated Plaintiff's RFC, and failed to provide a meaningful explanation for omitting any off task limitation.

3.    The ALJ failed to include all of Plaintiff's credibly established limitations in her hypothetical question to the vocational expert.

---

[3] The Court sets forth and considers Plaintiff's arguments in the order corresponding to the five-step sequential analysis.

(Pl.'s Br., ECF No. 11, at 4-26).

### A.    Treating Physician Opinions

The Commissioner modified Social Security's regulations in 2017, changing the way ALJs evaluate medical evidence.  The prior regulations, governing claims filed before March 27, 2017, divided medical sources into three categories: treating, examining, and non-examining.  *See* 20 C.F.R. § 416.927(c).  ALJs were to weigh each medical opinion and could sometimes afford controlling weight to opinions from treating sources. *See id.*

Under the new regulations, ALJs do not place medical sources into these categories and can no longer afford controlling weight to any opinion.  *See id.* § 416.920c(a).  Instead, ALJs now evaluate the persuasiveness of each medical opinion and each prior administrative medical finding.  *See id.*  Five factors determine persuasiveness:  (1) supportability; (2) consistency; (3) relationship with the claimant, including length, purpose, and extent of the treatment relationship, as well as frequency of examinations and whether the medical source examined the claimant firsthand; (4) specialization; and (5) other factors, like "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."  *Id.* § 416.920c(c). Supportability and consistency are the most important factors.  *Id.* § 416.920c(b)(2).  ALJs need not explain their determinations regarding the other factors, but they must discuss supportability and consistency. *Id.*

Regarding supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  *Id.* § 416.920c(c)(1).  Regarding consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the

evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 416.920c(c)(2).

Here, Plaintiff contends that the ALJ misapplied § 416.920c and erroneously rejected the opinions of Plaintiff's treating gastroenterologist and psychiatrist, Drs. Kaufman and DelBusto.

### 1.    Dr. Kaufman

Regarding Dr. Kaufman's opinion, the ALJ wrote:

> The 2021 opinion of Adam Kaufman, M.D., is partly persuasive. The need for access to a bathroom and additional breaks are primarily supported by noted chronic conditions with symptoms including diarrhea, fatigue, and malaise.  However, more significant limitations, including inability to sustain a typical work month is not corroborated by more significant findings on exams or history of treatment such as need for hospital care.  They are not consistent with imaging showing lack of more significant damage to the gastrointestinal system or overall care which has noted stability with infusions and medication therapy.  Some hospital visits were noted but they were not associated with flares of his condition, instead more strongly associated with poor response to medications.  These restrictions are also not consistent with claimant's history of hobbies including gaming and volunteering with an ability to start working part-time with reduction of symptoms allowing increase in activity.  The claimant reported 6-hour shifts and being able to stand and walk through those shifts at the most recent hearing.
>
> Dr. Kaufman provided an updated statement in August 2024 indicating the claimant's condition had not changed, but he continued to have chronic pain.  His status had not changed from the prior statement from 2021.  This opinion is at most partly persuasive.  While there is no specific support for need for access for a bathroom or additional breaks, it is consistent with ongoing care.  More significant limitations are only supported by reports of pain, and they are not consistent with Dr. Kaufman's own notes which indicate intermittent pain, urgency, and other symptoms and indicate ongoing physical activity.

(R. 1299-1300).

### a.    The Parties' Positions

Plaintiff first observes that, as confirmed by the VE and the Commissioner's own policy

interpretation, Dr. Kaufman's opinion—including his conclusion that Plaintiff would miss more than four workdays monthly and that he would require multiple unscheduled restroom breaks per day—would be work-preclusive and compel a finding that Plaintiff is disabled.  (Pl.'s Br., ECF No. 11, at 7-8 (citing SSR 96-8p, 1996 WL 374184 (July 2, 1996)); R. 1356-57).  He then contends that the ALJ's finding that Dr. Kaufman's opinion that he required immediate access to a restroom and additional breaks was supported and consistent, and thus persuasive, and that it alone necessitated a finding of disability given that the first VE testified that these restrictions would be work-preclusive.  (*Id.* at 8; Reply, ECF No. 18, at 3 (citing R. 75)).

Next, Plaintiff asserts that the ALJ failed to adequately consider the supportability or consistency of Dr. Kaufman's opinion in finding certain portions thereof unpersuasive.  (Pl.'s Br., ECF No. 11, at 9-14).  As to supportability, Plaintiff highlights that Dr. Kaufman noted Plaintiff: experienced weight loss upwards of 30 pounds; reported chronic abdominal pain with a baseline of three or four on a scale of 10; suffered from diarrhea, nausea, acid reflux, oral aphthous ulcers, and anal fissures; and had trouble consistently eating meals.  (*Id.* at 9-10 (citing R. 391, 405, 636, 655)).  According to Plaintiff, had the ALJ considered this evidence, she would have seen that Dr. Kaufman's treatment records supported his opinion.  (*Id.* at 10).

Regarding consistency, Plaintiff first contends that the ALJ made factual errors in rejecting portions of Dr. Kaufman's opinion on the purported grounds that: his gastrointestinal issues did not result in hospitalizations; he was stable throughout the course of his Remicade treatment; and the imaging contained in the record did not show significant damage to his gastrointestinal system .  (*Id.* at 11-12).  Thereafter, Plaintiff contends that the ALJ's consideration of his hearing testimony was incomplete as she failed to acknowledge that even though he conceded that he worked and volunteered part-time, he nevertheless qualified that he frequently had to call out from his shifts and take frequent, unscheduled breaks throughout the day.  (*Id.* at

22

12-13 (citing R. 1326-50, 1495-98)).  Therefore, to the extent the ALJ relied upon Plaintiff's testimony that he "reported 6-hour shifts and being able to stand and walk through those shifts" as a reason for finding portions of Dr. Kaufman's opinion unpersuasive, Plaintiff argues that the ALJ disregarded important context from his testimony.  (*Id.* (citing R. 1300, 1329-30, 1335-36, 1345-46, 1512)).

Finally, Plaintiff contends that the persuasiveness of Dr. Kaufman's opinion was bolstered by his specialization and multi-year treating relationship with Plaintiff, which gave him a unique, longitudinal perspective of Plaintiff's gastrointestinal issues.  (*Id.*).

The Commissioner responds that although the ALJ acknowledged Plaintiff had certain digestive problems that required ready access to a restroom, she also found in the RFC that any time spent off task would not exceed 10 percent of the workday.  (Resp., ECF No. 17, at 11 (citing R. 1292)).  Therefore, the Commissioner argues that read in context (and contrary to Plaintiff's interpretation of the decision), the ALJ did not fully credit the portion of Dr. Kaufman's opinion that Plaintiff would have only a few seconds' warning before needing the restroom, nor that these unscheduled breaks would last 30 to 60 minutes.  (*Id.* at 5-12).  Moreover, the Commissioner observes that the ALJ rejected the other relevant portions of Dr. Kaufman's opinion, including that Plaintiff would miss more than four days of work per month based on his impairments.  (*Id.*).  According to the Commissioner, this determination was supported by substantial evidence.  (*Id.*).

As for the ALJ's consideration of the opinion's supportability and consistency, the Commissioner contends that: the ALJ's rationale for finding the opinion only partially persuasive may be reasonably traced through the contours of the decision; that rationale was supported by substantial evidence (including findings on imaging and biopsies, lack of hospitalizations or more significant signs on exams, inconsistent symptoms reported to providers, and Plaintiff's

reports that he was able to volunteer, work part-time, play board games in a social setting, and perform certain household chores and other ADLs); and Plaintiff's arguments to the contrary merely amount to a request to this Court to reweigh the evidence. (*Id.* at 3-12 (citing R. 586-99, 1300, 1396, 1662-1701, 1736-40, 1770-74, 1799-1803)).

### b.      Analysis

A claimant's RFC measures "the most [he] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). The ALJ alone is responsible for formulating a claimant's RFC and making the ultimate disability determination. In doing so, the ALJ must examine "all of the relevant medical and other evidence" to make the RFC determination. *Id.* § 416.945(a)(3). In making her determinations, the ALJ is "free to accept some medical evidence and reject other evidence," so long as she "provides an explanation for discrediting the rejected evidence." *Zirnsak v. Colvin*, 777 F.3d 607, 614 (3d Cir. 2014). The ALJ has the duty to adequately explain the evidence that she rejects or to which she affords lesser weight. *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 505-06 (3d Cir. 2009). Although "any statements of the individual concerning his or her symptoms must be carefully considered," SSR 96-7p, 1996 WL 374186 (July 2, 1996), the ALJ is not required to credit them, 20 C.F.R. § 416.929(a). When formulating a claimant's RFC, the ALJ must include all credibly established limitations. *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004) (citing *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)).

Initially, the parties dispute the correct interpretation of the ALJ's decision, with Plaintiff arguing that the ALJ fully credited the portion of Dr. Kaufman's opinion that he: required ready access to a restroom; would have multiple unscheduled breaks per day lasting between 30 and 60 minutes; and would have at most "seconds" before soiling himself. (Pl.'s Br., ECF No. 11, at 7). The Commissioner responds that the ALJ's ultimate RFC determination finding that Plaintiff's work station must be within two-three minutes from a restroom and would be off task no more

24

than 10 percent of the time forecloses Plaintiff's interpretation.  (Resp., ECF No. 17, at 11).

Gleaning the ALJ's view of Dr. Kaufman's opinion proves difficult: the Commissioner is correct

that the ultimate RFC determination comports with her not fully crediting the opinion as to

Plaintiff's need for restroom breaks, but Plaintiff likewise accurately points out that in addressing

these limitations specifically, the ALJ did not equivocate but instead flatly stated that this portion

of the opinion was both "supported" by Dr. Kaufman's treatment notes and "consistent with

ongoing care." (R. 1299-1300).  The correct interpretation of the ALJ's determination on this

point matters not, however, as even if the Commissioner is right, the ALJ still failed in her duty

to explain how she evaluated Dr. Kaufman's opinion.

An ALJ must "explain" how he or she considered both the supportability and consistency

of a medical opinion.  20 C.F.R. § 416.920c(b)(1)-(2), (c)(1)-(2).  Here, the ALJ noted that the

need for access to the restroom and additional breaks was supported by "noted chronic

conditions with symptoms including diarrhea, fatigue, and malaise."  (R. 1299 (citing R. 1765-

1824)).[4]  Then in addressing Dr. Kaufman's August 2024 opinion in which he opined that

Plaintiff's condition had not changed, the ALJ stated that this limitation was "consistent with

ongoing care."  (R. 1300).  Confusingly, however, she also stated that "there is no specific

support for need for access for a bathroom or additional breaks," though she did not reconcile

this finding with the fact that she had earlier stated that the opinion was supported by Dr.

Kaufman's treatment notes.  (R. 1299-1300).  The ALJ ended her analysis there, offering no

reason why this limitation should not have been fully credited and therefore included in

Plaintiff's RFC, given that she had found it both well-supported and consistent with other record

evidence.  *Cf. Ramirez*, 372 F.3d at 552 (holding that the ALJ must include all credibly

---

[4] This broad swath of pages from the record includes Dr. Kaufman's treatment notes for
Plaintiff over the course of several years.

established limitations in the RFC); *Chrupcala*, 829 F.2d at 1276 (same).

If the ALJ determined that the limitation was supported only to the extent that Plaintiff "require[d] ready access to a restroom meaning it must be 2-3 minutes from [his] workstation and will be off task no more than 10% of the workday," (as expressed in the RFC determination (R. 1292)), then she should have said so and explained why. *See Cotter v. Harris*, 642 F.2d 700, 704-06 (3d Cir. 1981) (noting the ALJ must explain both the evidence supporting her findings and the reasons for her decision). Moreover, to the extent the ALJ found that Dr. Kaufman's proffered limitation was not fully consistent with other record evidence, the ALJ was required to say so, pointing to the record evidence she found more credible. *Id.* Ultimately, the ALJ did neither of these things, thereby failing in her duty to explain the rationale behind her decision. *See id.* at 704 (the ALJ's finding of residual functional capacity must "be accompanied by a clear and satisfactory explication of the basis on which it rests"); *see also Diaz*, 577 F.3d at 504 ("The ALJ must provide a 'discussion of the evidence' and an 'explanation of reasoning' for his conclusion sufficient to enable meaningful judicial review.") (quoting *Burnett*, 220 F.3d at 120).

In addition to this error, Plaintiff contends that the ALJ made "mistakes of fact" in evaluating Dr. Kaufman's opinion. (Pl.'s Br., ECF No. 11, at 12). Again, I agree with Plaintiff.

In evaluating the consistency of the opinion and ultimately finding unpersuasive the "more significant limitations [opined by Dr. Kaufman], including inability to sustain a typical work month," the ALJ relied upon several factors, including (as relevant here): Plaintiff's lack of hospitalizations for his gastrointestinal issues; Plaintiff's demonstrated "stability" during his course of Remicade infusions; Plaintiff's reported ADLs, volunteer activity, and ongoing employment; and imaging showing "lack of more significant damage to the gastrointestinal system." (R. 1299-1300). Plaintiff takes issue with each of these characterizations. Though this Court, sitting in review, owes significant deference to an ALJ's findings of fact, *Hartranft*, 181

26

F.3d at 360, ultimately the ALJ improperly cherry-picked and otherwise mischaracterized most of this evidence. *See Cotter*, 642 F.2d at 707 (misconstrued evidence potentially affecting the decision requires remand); *Piper v. Saul*, No. 2:18-1450, 2020 WL 709517, at *4 (W.D. Pa. Feb. 12, 2020) ("The ALJ is not entitled to 'cherry pick' favorable evidence and ignore records that run counter to her findings.").

First, though the ALJ acknowledged that Plaintiff was hospitalized several times during the relevant period, she asserted that these hospital visits "were not associated with flares of his condition, [but were] instead more strongly associated with poor response to medications." (R.1299-1300 (citing R. 1750-54)). This characterization of Plaintiff's hospitalizations is belied by the record. Though both medical professionals and Plaintiff himself suggested at times that his hospitalizations resulted, *at least in part*, from a poor response to medications, the record is also abundantly clear that these hospital stays stemmed from flares of his gastrointestinal issues. In each instance, Plaintiff reported some combination of symptoms related to his Crohn's disease (including nausea and vomiting, loose stool, acid reflux, lightheadedness, and generalized abdominal pain and tenderness) before and/or during the ER visit, and the medical professionals who treated him associated the visits with his Crohn's disease. (*See, e.g.*, R. 960-67, 968-975, 976-984, 985-991, 995-1021, 1022-1047). Moreover, Plaintiff was administered Bentyl—a prescription antispasmodic medication used to treat gastrointestinal issues—at nearly all his ER visits. (*Id.*). To say these hospitalizations were not associated with flares of his gastrointestinal issues—as the ALJ did here—is simply not supported by the evidence.

Second, as explained in this Court's prior opinion, *Gongon*, 676 F. Supp. 3d, at 397-98, to the extent the ALJ alleges that Plaintiff's symptoms had stabilized since he began a course of Remicade infusions, this finding ignores the fact that Plaintiff nonetheless had to seek emergency treatment notwithstanding the infusions. (*See, e.g.,* R. 960-66, 968-781, 985-91). At these visits,

Plaintiff continued to exhibit symptoms of his Crohn's disease. (R. 960, 968, 973, 975-76. 981, 983-86).  During this period, he also suffered from weight loss, anal fissures, and abdominal pain and vomiting not requiring emergency treatment.  (R. 402, 405, 636).

Third, the ALJ's treatment of Plaintiff's reported ADLs and employment was also problematic.  Though it was certainly permissible for her to note Plaintiff's testimony regarding his activities when considering the persuasiveness of Dr. Kaufman's opinion, the ALJ's treatment of his employment, in particular, lacked important context.  The ALJ highlighted that Plaintiff "reported 6-hour shifts and being able to stand and walk through those shifts at the most recent hearing." (R. 1300).  However, this statement ignores the fact that Plaintiff also testified that he frequently had to "call out" from his shifts due to flare ups of his condition, and that even when he goes to work, he still takes unscheduled breaks as needed and is allowed to leave whenever he must.  (R. 1335, 1345-46).  The VE confirmed that an individual missing this amount of time would not be able to maintain employment.  (R. 1356).  Though the ALJ was not required to credit Plaintiff's testimony on this point, she at least had to weigh it along with the other record evidence and, if she did not find it credible, explain why.  *See Becker v. Comm'r of Soc. Sec.*, 403 F. App'x 679, 685 (3d Cir. 2010) ("To ensure meaningful review, the ALJ must discuss 'the evidence he considered which supports the result' and 'the evidence which was rejected,' and should give his reasons for accepting only some evidence while rejecting other evidence.") (citations omitted).  In the absence of such explanation, the Court cannot tell if the ALJ here simply ignored the full context of Plaintiff's testimony.  *See Cotter*, 642 F.2d at 705 ("In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.").

Considered collectively, these errors undermine the ALJ's analysis and ultimate conclusions regarding the persuasiveness of Dr. Kaufman's opinion, necessitating remand.  *See*

*Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir. 2009) ("[I]t is not that the [mistake of fact] requires a different finding; rather, the ALJ's basis for his credibility determination on this issue is wrong, and so the ALJ must reconsider the credibility determination in light of the [ignored] evidence.") (citing *Allord v. Barnhart*, 455 F.3d 818, 822 (7th Cir. 2006)).

Nonetheless, I write briefly to address Plaintiff's remaining arguments. In addition to the contentions set forth above, Plaintiff argues that the ALJ's evaluation of the various scans of his abdomen and ultimate conclusions drawn therefrom were not supported by the evidence. (Pl.'s Br., ECF No. 11, at 10-12). However, this argument is unavailing. The ALJ's conclusion that imaging of Plaintiff's abdomen did not show significant damage to his gastrointestinal system was supported by substantial evidence, and therefore the ALJ did not err in weighing that evidence as a factor against the "more significant limitations" that Dr. Kaufman opined. (*See* R. 1294 (noting "endoscopic procedures showing esophageal edema with biopsies also noting multiple abnormalities including chronic inflammation[ and c]olonoscopies [which] noted granuloma and edema" but finding that evidence was "not as consistent about active disease" and also noting that hospital lab results were typically "normal") (citing R. 390-96, 508-26)).

Plaintiff insists that in fact various scans *do exist* that showed significant damage to his gastrointestinal system. (Pl.'s Br., ECF No. 11, at 10-12). He points out that the ALJ herself highlighted "endoscopic procedures showing esophageal edema," "biopsies [noting] multiple abnormalities including chronic inflammation," and colonoscopies noting granuloma and edema. (*Id.* at 10 (quoting R. 1294)). Moreover, Plaintiff observes that Dr. Kaufman "detailed multiple objective findings in his treatment records." (*Id.* (citing R. 655)). Nevertheless, these findings show only that the conditions (edema, chronic inflammation, and granuloma) *existed*, without reflecting their level of severity, and Plaintiff does not point to any medical opinion evidence that indicates that they were sufficiently severe so as to warrant greater RFC restrictions. *See* 20

29

C.F.R. § 416.912; *see also Cotter*, 642 F.2d at 708 ("The burden is, of course, on the claimant to demonstrate by medical evidence that he is [disabled].") (citing *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979)).  Contrary to Plaintiff's arguments, the fact that the ALJ emphasized this evidence demonstrates that she considered it but simply reached a different conclusion than that sought by Plaintiff.  However, the Court cannot replace the ALJ's judgment with its own.  *See Zirnsak*, 777 F.3d at 611.  Instead, it can only ask whether the record evidence suffices to allow a "reasonable mind" to find that the ALJ's assessment was adequate, *see Pierce v. Underwood*, 487 U.S. 552, 565 (1988), and regarding the ALJ's analysis of Plaintiff's abdominal imaging, it does.

Lastly, to the extent Plaintiff posits that Dr. Kaufman's opinion was persuasive due to his specialization and treatment relationship with Plaintiff, (Pl.'s Br., ECF No. 11, at 14), the ALJ, in her discretion, need only reference these other factors if she finds that the opinion was equally persuasive, well-supported, and consistent with the record evidence as another opinion on the same issue.  20 C.F.R. § 416.920c(b)(3).  Here, the ALJ made no such finding, and thus she was not required to articulate her consideration of these factors.  *See David M. v. Bisignano*, No. 24-4273, 2025 WL 3765696, at *12 (E.D. Pa. Dec. 30, 2025) ("[T]he ALJ's failure here to explicitly discuss the implications of Dr. Monfared's and Dr. O'Rourke's specializations or relationships with [the claimant] does not, without more, mean that her decision lacked substantial evidence.").

Ultimately, based on the aforementioned errors, I conclude that the ALJ did not properly address the supportability and consistency of Dr. Kaufman's opinion as required by 20 C.F.R. § 416.920c(c)(1)-(2).  In light of this failure, the Court remands this matter for a proper evaluation of those factors.

### 2.    Dr. DelBusto

Regarding Dr. DelBusto's opinion, the ALJ wrote:

> The opinion of Elena DelBusto, M.D., is at most partly persuasive. Some limitations are partly supported by noted history of physical and mental impairments with both affecting functioning. Combined effects of conditions affecting mental functioning, including ability to sustain a typical workday, are consistent with overall history of care, with providers noting physical and mental impairments affecting his functioning. However, the more significant limitations provided are not consistent with the record, particularly such findings as minimal capacity to adapt to change. He has not been recommended more intensive care, only medication and therapy since 2019. There is no indication of need for psychiatric hospitalization. There have been reports of volunteering and gaming, which indicate greater concentration or social interaction ability than acknowledged in Dr. DelBusto's treatment notes or opinion. The claimant has testified to working part time with shifts lasting 6 hours. Work has included duties as a cashier, which indicates greater mental functioning than provided by the source. He has also reported performing chores, walking the dog, volunteering and spending time with friends at a gaming store.
>
> A subsequent statement from Dr. DelBusto in 2024 is not persuasive. What limitations are given are vague statements of significant problems in activities due to symptoms. They are supported, but primarily from symptoms, not signs. Noted report of loss of weight is not consistent with medical records not generally noting significant weight loss or need to mitigate such by treating providers. Significant limitations in mental work-related activities are not consistent with activity as reported to various providers, including work activity, volunteering, and gaming. There is no indication of recommendation of re-enrollment to intensive outpatient care or hospitalization. The portions of the opinion indicating impairments are "disabling" and "significantly limit his ability to sustain gainful employment" are on issues reserved for the Commissioner and neither valuable nor persuasive.

(R. 1300 (record citations omitted)).

### a.    The Parties' Positions

Plaintiff first points out that both VEs agreed that the limitations proffered by Dr.

DelBusto, if accepted by the ALJ, would have been work-preclusive.  (Pl.'s Br., ECF No. 11, at 17

(citing R. 74-75, 1357)).  He then argues that the ALJ in fact credited Dr. DelBusto's finding that Plaintiff had no useful ability to complete a normal workday, specifically noting that it was consistent with the medical and nonmedical evidence.  (*Id.*).  In his reply, Plaintiff notes that the Commissioner agrees that the ALJ credited this portion of Dr. DelBusto's opinion, and that this alone necessitated a finding of disability as confirmed by the VE testimony in this case.  (Reply, ECF No. 18, at 5 (citing R. 75, 1357)).

Plaintiff then turns to the ALJ's supportability and consistency analysis generally.  (Pl.'s Br., ECF No. 11, at 17-22).  He argues that the ALJ simply failed to address supportability and that her consistency analysis was "erroneous."  (*Id.* at 5-6; Pl.'s Br., ECF No. 11, at 17-22). Regarding supportability, Plaintiff maintains that if the ALJ had considered Dr. DelBusto's statements in the opinion itself as well as her July 1, 2024, letter elaborating upon Plaintiff's treatment history with her—including that: Plaintiff's mental health problems are "closely tied to" and "directly" affected by his underlying gastrointestinal problems; his sleep was disrupted, his appetite was variable, and his concentration and energy levels were low; his chronic pain appeared to be a major contributing factor to his depression; and he required intensive ongoing treatment—she would have found the opinion persuasive.  (*Id.* (citing R. 1162-63, 1513-14)).

Similarly, he contends that if the ALJ had correctly considered consistency, she would have determined that Dr. DelBusto's opinions comported with the other medical evidence in the record, including: (1) Schlingmann's treating source statement and opinion finding that Plaintiff had significant limitations (to varying degrees) in certain abilities related to handling the mental stresses of work; and (2) the letter from Poppel explaining that because of his physical condition he dropped out of high school and later community college, lost contact with his friends, had worsening depressive symptoms, feared socializing, and reported feeling lonely and irritable, having a negative outlook, and worrying.  (*Id.* at 20-21 (citing R. 333-34, 601-02)).

Plaintiff further observes that in rejecting Dr. DelBusto's opinion the ALJ relied on Plaintiff's own reports of ADLs including volunteering and gaming with others to find that he had "'greater concentration and social interaction ability than acknowledged' by Dr. DelBusto." (*Id.* at 19 (citing R. 1300)). However, according to Plaintiff, this supposed "contradiction" between his self-reported functioning and that assessed by the ALJ is a red herring because, in fact, she did not opine that he had difficulties in these areas, instead noting "him to have few if any limitations in his abilities to understand, remember and carry out instructions, accept instructions and criticism from supervisors, get along with coworkers, or interact with the general public." (*Id.* at 19-20 (citing R. 1161)). Therefore, Plaintiff contends that the ALJ's conclusion is "misplaced" as it did not address the substantive limitations actually determined by Dr. DelBusto, i.e., that Plaintiff:

> has no useful ability to function in making simple work-related decisions and completing a normal workday and workweek without interruptions from psychologically based symptoms [and] was unable to meet competitive standards in 1) maintaining regular attendance and punctuality within customary, usually strict tolerances, 2) sustaining an ordinary routine without special supervision, 3) working in coordination with or proximity to others without being unduly distracted, 4) performing at a consistent pace without an unreasonable number and length of rest periods, 5) responding appropriately to changes in a routine work setting, and 6) dealing with normal work stress.

(*Id.* at 16-17, 20 (citing R. 1161)).

Lastly, Plaintiff argues that the ALJ should have afforded Dr. DelBusto's opinion more weight given her specialization and treating relationship with Plaintiff. (*Id.* at 21-22). Ultimately, Plaintiff submits that had the ALJ properly considered Dr. DelBusto's opinion, she would have found it persuasive and him disabled. (*Id.* at 22).

In response, the Commissioner first observes that the ALJ explained that the RFC limitations she assessed regarding Plaintiff's ability to sustain a typical workday were consistent

33

with overall history of care.  (Resp., ECF No. 17, at 7).  He then contends that the more

significant mental limitations that Dr. DelBusto proffered were not consistent with the record

evidence, and therefore the ALJ's determination that her opinion was only partially persuasive

was supported by substantial evidence.  (*Id.* at 7-9).  Specifically, the Commissioner notes that

the ALJ highlighted: that Plaintiff has not been recommended for more intensive care, only

medication and therapy since 2019; the record did not indicate the need for psychiatric

hospitalization; and Plaintiff reported extensive ADLs including volunteering, gaming, working

part time as a cashier, performing chores, and walking his dog.  (*Id.* at 7 (citing R. 151-21, 342,

586-99, 1300, 1322-23, 1326-27, 1332-35, 1339-40, 1513-14, 1662-1701, 1736-40, 1770-74, 1799-

1803)).  Ultimately, the Commissioner argues that the ALJ's opinion comports with the

applicable standards contained in the regulations and that Plaintiff's arguments amount to a

request for this Court to impermissibly reweigh the evidence.  (*Id.* at 7-9).

### b.    Analysis

The ALJ erred in her consideration of Dr. DelBusto's opinion.  As noted by Plaintiff, the

ALJ found the opinion that Plaintiff had no useful ability to complete a normal workday both

"partly supported" and "consistent" with the evidence, (R. 1300), and the VE concluded that this

limitation alone would foreclose the ability to perform competitive work.  (Reply, ECF No. 18, at

5 (citing R. 75, 1357)).  Therefore, Plaintiff observes that it is unclear how the ALJ resolved this

inherent inconsistency, given that she included no such corresponding restriction in the RFC and

ultimately determined that Plaintiff could, in fact, perform certain jobs.  (*Id.*; R. 1292, 1303); *cf.*

*Ramirez*, 372 F.3d at 552 (holding that the ALJ must include all credibly established limitations

in the RFC); *Chrupcala*, 829 F.2d at 1276 (same).  The Commissioner does not respond to this

argument.

Plaintiff's argument is well-taken, as a determination that he has no useful ability to

complete a normal workday would, on its face, compel a finding of "disabled." The ALJ did not resolve this inconsistency, and therefore abdicated her duty to explain her rationale. *See* 82 Fed. Reg. 5844-01, 2017 WL 168819, at \*5858 (Jan. 18, 2017) (the ALJ's decision must "allow . . . a reviewing court to trace the path of an adjudicator's reasoning"); *see also Lawrence v. Kijakazi*, No. 22-cv-4995, 2023 WL 7129950, at \* 10 (E.D. Pa. Oct. 30, 2023) ("[A] reviewing court must be able 'to trace the path of an adjudicator's reasoning'") (quoting 82 Fed. Reg. 5844-01, at 5858); *Robert I. v. O'Malley*, No. 1:22-cv-1892, 2024 WL 3102224, at \*14 (D.N.J. June 24, 2024) (the "ALJ's discussion must provide for 'meaningful review' when 'read as a whole'") (quoting *Jones*, 364 F. 3d at 505).

However, to the extent that Plaintiff argues the ALJ erred in her consideration of "the rest of Dr. DelBusto's opinion," (Pl.'s Br., ECF No. 11, at 17), I disagree. Plaintiff posits that the ALJ completely omitted any reference to supportability in evaluating Dr. DelBusto's opinion, (*Id.* at 18-19), but this contention is belied by the decision itself, as the ALJ expressly stated that "[s]ome limitations are partly *supported* by noted history of physical and mental impairments with both affecting functioning." (R. 1300 (emphasis added)). Moreover, the ALJ specifically considered the July 1, 2024, letter referenced by Plaintiff, noting that the limitations contained therein were supported "primarily from symptoms, not signs." (R. 1300). Although it remains unclear exactly what the ALJ meant in drawing a distinction between "symptoms" and "signs," the reference to the "symptoms" noted by Dr. DelBusto, along with the prior one to Plaintiff's history of impairments affecting his function, satisfy the Court that the ALJ considered the supportability of the opinion when she found it at least partially persuasive. Inasmuch as Plaintiff cites Dr. DelBusto's specific claims in her letter that his Crohn's disease appeared to be a contributing factor to his mental health issues that required intensive ongoing treatment and that he: was significantly limited by his chronic pain and depression; found it difficult to sustain

even part-time work; experienced disrupted sleep and appetite; and had variable concentration and energy levels—no indication exists that the ALJ did not consider these factors in her analysis. *See, e.g.*, *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004) (noting it is well-established that the ALJ need not discuss "every tidbit of evidence included in the record"). In fact, as noted below, the ALJ found certain limitations opined by Dr. DelBusto (including some of those noted in her letter) inconsistent with other record evidence. (*Id.*). That analysis was also free from error.

As for consistency, Plaintiff first challenges the ALJ's conclusion that his ADLs showed "greater concentration and social interaction ability than acknowledged" by Dr. DelBusto. (Pl.'s Br., ECF No. 11, at 19 (quoting R. 1300)). He argues that this analysis missed the mark because Dr. DelBusto did *not* find that he was significantly limited in such relevant functioning as his abilities to understand, remember and carry out instructions, accept instructions and criticism from supervisors, get along with coworkers, or interact with the general public. (*Id.* at 19-20 (citing R. 1161)). In other words, in seizing upon limitations that DelBusto never endorsed, Plaintiff maintains that the ALJ effectively fabricated a non-issue to discount the opinion.

However, several of the *other* significant limitations that Dr. DelBusto assessed in her opinion did in fact touch on Plaintiff's ability to concentrate on work and socialize with others, at least to some extent. Pertinent here, she opined that Plaintiff: was "seriously limited" in maintaining attention for a two-hour segment; was "unable to meet competitive standards" in sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being unduly distracted, and responding appropriately to changes in a routine work setting; and had "no useful ability to function" in making simple work-related decisions and completing a normal workday and workweek without interruptions from psychologically-based symptoms. (R. 1161). Each of these proffered limitations, to varying

36

degrees, involve either his ability to concentrate or to socialize while at work.  Therefore, to the

extent that Plaintiff argues the ALJ's determination was not responsive to the general thrust of

Dr. DelBusto's opinion, that contention is belied by the record.

Moreover, to the extent that Plaintiff challenges the ALJ's substantive conclusion that his

ADLs such as volunteering and gaming with others in fact illustrate that he is not as limited in

his ability to concentrate or socialize while at work as suggested by Dr. DelBusto, that is a

finding of fact to which this Court owes deference.  *Hartranft*, 181 F.3d at 360.  The

consideration of Plaintiff's ADLs as one factor among several in evaluating Plaintiff's subjective

complaints was in keeping with the regulations.  *See* 20 C.F.R. § 416.929(c)(3)(i) (listing "[y]our

daily activities" as one of seven "factors relevant to your symptoms, such as pain, which we will

consider"); *see also* 16-3p, 2016 WL 1119029(d)(1) (Mar. 16, 2016) (listing "[d]aily activities" as

one of the seven factors to evaluate the intensity, persistence, and limiting effects of an

individual's symptoms).

Next, Plaintiff contends that the ALJ erred in failing to find Dr. DelBusto's opinion

consistent with both the February 15, 2021, letter from Poppel and the July 15, 2024, opinion of

Schlingmann.  (Pl.'s Br., ECF No. 11, at 20-21).  Plaintiff contends that the relevant portions of

Poppel's letter included: her observations that Plaintiff presented as angry with increasing

depression; her notations that his Crohn's disease diagnosis prevented him from finishing high

school, subsequently led to him losing touch with his friends, and further prevented him from

completing college courses; and her review of his course of mental health treatment—notably his

time spent in intensive therapy at Solare.  (*Id.*).  Contrary to Plaintiff's arguments, however, no

indication exists that the ALJ ignored Poppel's findings regarding Plaintiff's demeanor, his

conditions causing him to withdraw from school and friends, or his treatment history.  Instead,

the ALJ's highlighting of his normal mood and affect and cooperative attitude at his consultative

mental exam and such ADLs as volunteering at a museum, working part-time, and spending his free time socializing with others at a gaming café indicates that she considered the types of abilities at issue in Poppel's letter, (R. 1297, 1300), but ultimately determined that the record evidence as a whole was not consistent with the more significant limitations opined by Dr. DelBusto.  Similarly, the ALJ found the opinion of Schlingmann (largely similar to that offered by Dr. DelBusto) unpersuasive, again noting Plaintiff's ADLs, lack of psychiatric hospitalizations, and lack of intensive treatment after 2019.  (R. 1300-01).  Thus, the ALJ considered the consistency of Dr. DelBusto's opinion with the other record evidence and ultimately found her opinion only partially persuasive.  (R. 1300).  Therefore, her supportability and consistency analysis were not erroneous.

Lastly, Plaintiff's argument that Dr. DelBusto's opinion should have been found persuasive given her specialization and treating relationship with Plaintiff, (Pl.'s Br., ECF No. 11, at 21), fails for the same reason that her identical argument regarding Dr. Kaufman's opinion fails (*see supra*, § V.A.1.B): the regulations do not require the ALJ to explain how she considered these factors specifically.  *See* 20 C.F.R. § 404.1520c(b)(2); *see also David M.*, 2025 WL 3765696, at *12.

In sum, for the reasons laid out above, the ALJ erred in her evaluation of the opinions of both Dr. Kaufman and Dr. DelBusto.  On remand, the ALJ shall further consider and weigh the medical source opinions as outlined in this Memorandum Opinion.

### B.    Plaintiff's Remaining Arguments

In addition, Plaintiff contends that the ALJ's failure to appropriately evaluate the evidence, including the opinions of Drs. Kaufman and DelBusto, resulted in an "overstated" RFC at step four, without a meaningful explanation for the omission of an "off task" limitation.  (Pl.'s Br., ECF No. 11, at 22-25).  He further argues that at step five the ALJ failed to include all his

credibly established limitations in the hypothetical to the vocational expert. (*Id.* at 25-26). However, the Court need not decide whether these issues—which would be addressed later in the five-step analysis—constitute a basis for remand. If the ALJ determines on remand that proper consideration of the opinions of Drs. Kaufman and DelBusto warrant a more restrictive RFC, Plaintiff's claim of an "overstated" RFC may fade away, as may his claim that the hypothetical flowing from that RFC fails to include all credibly established limitations. *See Steinninger v. Barnhart*, No. 04-5383, 2005 WL 2077375, at *4 (E.D. Pa. Aug. 24, 2005) (not addressing additional arguments because the ALJ may reverse his or her findings after remand). Accordingly, the Court does not consider these additional arguments at this time.

C.      **Remedy**

As for Plaintiff's request that the Court "reverse the decision of the Commissioner and order that he be found disabled," (Pl.'s Br., ECF No. 11, at 27), I decline to grant such relief. Plaintiff contends that he is entitled to a finding of disability and an award of benefits because he "has had to endure two hearings and two appeals to this Court without a proper decision from the Commissioner," and "the ALJ's decision has failed to comply with the previous remand order of this Court." (*Id.* at 27). I disagree and find that remand—rather than an award of benefits—is the appropriate remedy. *See Gilliland v. Heckler*, 786 F.2d 178, 184-85 (3d Cir. 1986). An award of benefits is only appropriate, "when no evidentiary questions remain and the outcome of the case is dictated as a legal matter." *See Freeman v. Berryhill*, No. 16-2610, 2017 WL 1351425, at *7 (E.D. Pa., 2017) *report and recommendation adopted*, 2017 WL 1375185 (E.D. Pa. April 10, 2017). That is not the case in the instant matter. On remand, the ALJ will further consider and weigh the medical source opinions as outlined in this Memorandum Opinion, which may affect the ultimate outcome of the case. Consequently, an award of benefits would be premature in this instance.

## VI.   CONCLUSION

For the reasons set forth above, Plaintiff's request for review is **GRANTED** to the extent that it requests remand.  This matter is remanded for further proceedings consistent with this memorandum.

BY THE COURT:

  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge